2019 IL App (4th) 170106
NO. 4-17-0106

FILED
June 10, 2019
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| TARYLL MUSGRAVE, | ) | No. 15CF275 |
| Defendant-Appellant. | ) | |
| | ) | The Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justice Knecht concurred in the judgment and opinion.
Justice Turner specially concurred, with opinion.

**OPINION**

¶ 1     In February 2015, defendant, Taryll Musgrave, was pulled over by the police while driving. During the traffic stop, defendant consented to being searched. Later that month, the State charged defendant with (count I) unlawful possession of a controlled substance with intent to deliver and (count II) unlawful possession of a controlled substance. 720 ILCS 570/401(a)(2)(A), 402(a)(2)(A) (West 2014). In September 2015, defendant filed a motion to suppress evidence obtained from the search conducted during the traffic stop. The trial court denied this motion.

¶ 2     In August 2016, the State and defense counsel presented the trial court with a proposed plea agreement in which defendant would plead guilty and be sentenced to 13 years in prison. Defendant rejected this agreement in open court and elected to proceed to trial.

¶ 3        In October 2016, the State dismissed count I and the parties proceeded to a stipulated bench trial on count II. The trial court found defendant guilty of count II (unlawful possession of a controlled substance). In December 2016, the court sentenced defendant to 16 years in prison.

¶ 4        Defendant appeals, arguing (1) the trial court should have granted his motion to suppress because the police prolonged the traffic stop beyond the time necessary to complete the mission of the stop, (2) the trial court's sentence was an abuse of discretion, and (3) the trial court imposed "a trial tax." We disagree and affirm.

¶ 5                          I. BACKGROUND

¶ 6                          A. The Charges

¶ 7        In February 2015, the State charged defendant with (count I) unlawful possession of a controlled substance with intent to deliver (more than 15 grams but less than 100 grams of a substance containing cocaine) and (count II) unlawful possession of a controlled substance (more than 15 grams but less than 100 grams of a substance containing cocaine). *Id.* §§ 401(a)(2)(A), 402(a)(2)(A). The State noted that defendant was extended-term eligible for count II due to his prior criminal record. After the trial court initially appointed the public defender's office at defendant's request, he chose to proceed *pro se*.

¶ 8                          B. The Motion To Suppress

¶ 9        In September 2015, defendant *pro se* filed a motion to suppress evidence obtained from a search conducted during his traffic stop. In his motion, defendant wrote that on February 26, 2015, he "was pull[ed] over for a traffic violation" and that "Officer Jared Johnson asked if I had anything illegal on me. He also ask[ed] for consent to search me. I granted the consent." In pertinent part, defendant essentially argued that his consent was "tainted" because the police

prolonged the stop beyond the time necessary to complete the mission of the stop.

¶ 10        In November 2015, the trial court conducted a hearing on defendant's *pro se* motion to suppress. Defendant first called Officer Tyrel Klein as a witness.

¶ 11                                        1. *Officer Klein*

¶ 12        Klein testified that he was a police officer with the Bloomington Police Department. On February 26, 2015 at 2:10 p.m., he pulled over a taxicab that defendant was driving. Klein noted that defendant had a passenger in the back seat of his taxicab. Klein stated that he pulled defendant over because he was speeding, failed to use his turn signal, and made an improper left turn. During the State's cross-examination, Klein testified as follows:

"Q. Now when you made the traffic stop, what did you initially do or say to the defendant?

A. I—like I do with every traffic stop—I introduced myself, and I explained the reason for the stop and I asked for [defendant's] driver's license and proof of insurance.

Q. And so you explained the speeding, as well as the signal and the turn issues?

A. Yes.

Q. Was that at about 14:10:59 [2:10 p.m.]?

A. Yes.

* * *

Q. And did, in fact, did you take his driver's license and insurance card?

A. Yes.

Q. And as part of your routine traffic stop, what do you do with those

items?

A. I completed a records check through the Illinois Secretary of State using my in-car computer.

Q. Do you have to walk back to your squad car [to do that]?

A. Yes.

Q. Initially you received the traffic driver's license and insurance card from the defendant at 14:11 and 33 seconds [2:11 p.m.]?

A. Yes.

Q. And did you go back to your car to fill out paperwork?

A. Yes.

Q. And as far as that goes, there is more than one form, correct?

A. Yes.

Q. Did you find out who [the] passenger was?

A. I did.

Q. Did you go on your computer to check to see whether that person was clear or had any active warrants or anything like that?

A. I checked that person as well.

Q. And did you check the defendant?

A. Yes.

Q. And what, if anything, did he as far as him being clear or valid [*sic*]?

A. His license was valid.

Q. Does that take a few minutes to run those records through the computer?

A. To type it in and run it, yes.

Q. Likewise, you had to obtain the identification from both individuals prior to that?

A. Yes.

Q. And you did all that, is that right?

A. Yes.

Q. And while you're doing that you also had to deal with paperwork, correct?

A. Correct.

Q. Did you—Officer Jared Johnson arrive[d] while you were dealing with paperwork and these records checks?

A. Yes.

Q. Was that about 14:18 and 36 seconds [2:18 p.m.]?

A. Yes.

Q. And as far as that goes, the paperwork you included, let's specifically talk about that. Did you get out and assist Officer Jared Johnson?

A. When I saw Officer Johnson placing the defendant into custody, I stepped up to assist.

Q. In the interim you were just doing paperwork and not helping [Officer Johnson] relating to his role?

A. Correct.

* * *

Q. Officer Johnson, what was his role?

A. He's a backup officer.

Q. Did he come to back you up?

A. Yes.

Q. As far as that goes, were you in the squad car when he was dealing with the defendant?

A. Yes.

* * *

Q. And did you see Officer Jared Johnson handcuff him?

A. Yes.

* * *

Q. And when he handcuffed him, is it fair to say that was about 14:20 and 25 seconds [2:20 p.m.]?

A. Yes.

Q. You hadn't completed all of your paperwork after doing the records check at that point, had you?

A. I had not.

Q. And, in fact, what paperwork, if any, had you fully completed?

A. I hadn't even fully completed the written warning.

* * *

Q. Did you finish that [written warning] after actually [*sic*] the traffic stop occurred?

A. Yes."

¶ 13                                2. *Officer Johnson*

- 6 -

¶ 14    Officer Johnson, during defendant's *pro se* direct examination, testified as follows:

"Q. *** Did you have occasion to see [me] parked in a vehicle ***?

A. Yes.

Q. Was I in the vehicle?

A. Yes.

Q. Was I with anyone?

A. Yes.

Q. Who was I with?

A. A passenger, female. I don't know [her] name.

Q. What type of vehicle was I in?

A. Taxi cab.

Q. Who was driving the vehicle?

A. You were.

* * *

Q. Then you asked [defendant] if you could search him to make sure he had nothing illegal on him?

* * *

A. That sounds accurate.

Q. You *** asked if there was any reason the K-9 would indicate for the odor of narcotics, correct?

A. At some point, yes.

* * *

Q. What was the situation you wanted to explain to the defendant when you requested him to exit the car?

A. That the K-9 was going to do a free-air sniff of the car, the K-9 was already on scene and by our policy we remove all occupants of the vehicle before the K-9 does a free-air sniff."

¶ 15 During the State's cross-examination, Johnson testified as follows:

"Q. You were the backup officer. Is that right?

A. Yes, sir.

* * *

Q. And when you arrived, when you went up to the car that the defendant was in at about 14:19 [2:19 p.m.] and 18 seconds. Is that right?

A. Correct.

* * *

Q. Did you tell him you were going to have him exit the car?

A. I did.

Q. Was there another officer who arrived by the name of Officer Shively?

A. There was.

Q. And why would you have him get out of the car, because Officer Shively was there?

A. Because Officer Shively is our K-9 officer *** by our policy for safety reasons, when we have the K-9 conduct a free-air sniff of the vehicle we have all of [the] occupants of the vehicle, with the exception of infants and small children, exit the vehicle.

Q. And so the female [passenger] was taken out of the car?

A. Eventually, yes.

Q. And the defendant got out of the car pretty easily. Is that right?

A. That's correct.

Q. Was he cooperative?

A. He was.

Q. And where did you go? Did you go off to the side of the road?

A. We got out of the lane of traffic and off to the side, yes.

Q. While that's happening, Officer Tyrel Klein, he's in his squad car, correct?

A. That's correct.

Q. What is he doing?

A. Running the driver's information, maybe issuing a citation.

Q. Just so it's clear, he's not helping you?

A. Negative, he's not [helping me].

Q. He's dealing with the traffic citation?

A. Correct.

\* \* \*

Q. So he's doing his paperwork related to the traffic stop, correct?

A. That's correct.

Q. And you're doing dealing [*sic*] with the defendant and the free-air sniff?

A. Correct.

Q. And Officer Shively is there as well?

A. That's correct.

Q. In fact, it didn't get to that point [of using the drug dog], though, did it?

A. It did not.

Q. And, in fact, at 14:19:36 [2:19 p.m.] you asked [defendant] if you [could] searched [*sic*] him real quick. Is that right?

A. That's correct.

Q. And [defendant] said if you want to. Is that right?

A. Correct.

* * *

Q. So, in fact, did you conduct that search?

A. I did.

Q. And where is Officer Klein at that time?

A. Still in the driver's seat of his squad car.

Q. Doing the paperwork?

A. Correct.

* * *

Q. And then at 14:20 and 25 seconds [2:20 p.m.], that's when you handcuffed the defendant?

A. That sounds correct.

Q. And where was Officer Klein at that time?

A. In his driver's seat.

Q. And, again, he wasn't helping you in any form or fashion dealing with

this secondary aspect or [the] K-9 free-air sniff preparation?

A. Correct."

¶ 16                                   3. *The Trial Court's Ruling*

¶ 17          Following this testimony, defendant *pro se* argued that "the officer went beyond the scope of the *** traffic stop *** which also tainted the consent to search." The State argued that the officers were "basically textbook perfect" and that they did not prolong the traffic stop. The trial court agreed with the State and denied defendant's *pro se* motion to suppress. The court found that, based on the evidence presented, "it's at most ten minutes, ten minutes from the time that the defendant was stopped until the time that he was actually placed under arrest, and that is not an unreasonable amount of time[.]" Following the denial of his *pro se* motion, defendant hired private counsel.

¶ 18                              C. The Rejected Plea Agreement

¶ 19          In August 2016, the State and defense counsel presented the trial court with a proposed plea agreement. Pursuant to this agreement, defendant would (1) plead guilty to count I (unlawful possession with intent to deliver), (2) receive a 13-year prison sentence, (3) receive credit for 525 days he had spent in pretrial custody, and (4) pay a $2000 fine. Further, the State would dismiss count II (unlawful possession of a controlled substance). In open court, defendant rejected the proposed agreement. In September 2016, the court reappointed the public defender.

¶ 20                              D. The Stipulated Bench Trial

¶ 21          In October 2016, the trial court conducted a stipulated bench trial. The State dismissed count I (unlawful possession with intent to deliver) and proceeded on count II (unlawful possession). 720 ILCS 570/401(a)(2)(A), 402(a)(2)(A) (West 2014). The State and defendant agreed to an evidence stipulation which, in pertinent part, stated the following:

(1) defendant was lawfully stopped and consented to be searched; (2) Officer Johnson found a cigarette package inside defendant's pocket which contained a white powdery substance; (3) this white powdery substance tested positive for the presence of cocaine and weighed 22.5 grams; and (4) the street value of the drugs was $2250. Defendant did not concede that this stipulation would be sufficient to find him guilty beyond a reasonable doubt. Following this stipulation, the court found defendant guilty of count II (unlawful possession of a controlled substance). *Id.* § 402(a)(2)(A).

¶ 22                                     E. Sentencing

¶ 23          In December 2016, the trial court conducted a sentencing hearing. The parties agreed that, due to defendant's prior convictions, his permissible sentence ranged from a 6-year minimum to a 30-year maximum. 730 ILCS 5/5-5-3.2(b)(1) (West 2016). In aggravation, the State highlighted defendant's criminal history, which included (1) a 1997 Class X felony conviction for possession of cannabis and (2) a 2007 Class 1 felony conviction for delivery of a controlled substance. Specifically, the State argued as follows:

          "Obviously the most aggravating factor here when you look at where the defendant is at today is his criminal record. It's significant. He's facing mandatory Class X sentencing because of his prior record. *** He served 10 years on that [1997 conviction]. Then he served 12 years on another drug offense [in 2007]. It's almost as if he's like serving a life sentence on the installment plan with drug offenses.

          At this point in time this defendant doesn't get it. He has no interest in leading a law-abiding life. Never had any real employment or anything like that in his entire life. His adult life has been about drugs. There is no realistic expectation

- 12 -

when you look at this defendant and history that he's going to change his ways."

¶ 24    Based upon this, the State recommended a 20-year sentence. Defense counsel requested a sentence "in the range" of 6 to 10 years. Defense counsel highlighted defendant's traumatic childhood, his good behavior while in pretrial custody, and his apparent drug addiction. Defense counsel further argued that defendant was neither violent nor a threat to society.

¶ 25    In his statement of allocution, defendant apologized and took "complete responsibility" for his actions. Defendant stated that drug addiction took control of his life. He admitted to using drugs while at work and was "ashamed" that he put his "customers and other pedestrians in harm's way" because of it. He further stated that he was "truly good" to his family and supported his children "first and foremost." However, defendant conceded that the rest of his money "went to [his] habits and addictions" and that his "savings, tips, and extra money" were used to purchase drugs. He stated that he had "sinned against [his] family" and that he had been "away from [his family] without being able to provide for them, provide for them [with] overall love and support." Defendant's presentence report stated that he "does not seem to contribute financially to support his family as he indicates his paychecks are often spent on illicit substances."

¶ 26    The trial court began by commending defendant for "thinking about *** how your actions have had an impact not only upon your own life but the life of your family in particular[.]" The court stated that by defendant's "own admission, at least for the last several years when you were full-time employed, it was your wife who was supporting financially the family's needs and expenses while you were taking the money that you were earning and selfishly spending it on yourself." The court stated that "part of accepting the blame or taking

responsibility, however, is being aware that consequences flow from those actions[.]"

¶ 27    The trial court also stated that defendant had significant rehabilitative potential because he took advantage of opportunities while in custody. The court stated that defendant had become a "role model" for other prisoners because he adhered to the rules and regulations of the facility and completed life skills and job training.

¶ 28    The trial court stated that defendant's "prior [criminal] history *** is a factor which the Court can and is taking into consideration along with *** all the factors in aggravation and mitigation." To this point, the court explained as follows:

> "But with your previous criminal history and the fact that you have been to prison not just on two previous occasions but for fairly lengthy periods of time, 12 years on the first offense in '97, and then 10 years on the second offense arising out of the incident in 2007. And so, when someone appears in court again for a serious felony, that, to me, is one of the reasons why the Court is allowed to look at one's history of prior delinquency and criminal activity, and also to look at whether or not a sentence is necessary to deter others from committing the same type of a crime, which is [why] there needs to be increasing responsibility. There needs to be an increase in the punishment which is imposed because if there's not an increase in general, not all the time, then one is rewarded for their behavior. Not only is one rewarded for their bad behavior but the message that is sent to others is not one of deterrence, it is one of roll the dice because good things might and/or could happen to you so long as you take responsibility for your actions. So I'm saying it's a balancing act."

¶ 29    Ultimately, the trial court (1) sentenced defendant to 16 years in prison,

- 14 -

(2) granted him 673 days credit for time already served, (3) imposed a $2250 fine, and (4) recommended defendant for substance abuse treatment. In reaching this conclusion, the court reasoned as follows:

> "I'm not going to impose the 20 years that [the State] requested, but the reason I'm not going to impose the 20 years is primarily based upon the fact that I do see the rehabilitative potential in yourself. The opportunity for you to continue to atone for your mistakes, for your transgressions, for your actions, and get you back to your family and hopefully get you back to your family in a sense where you can not only be there for them as a husband and a father, but also as one who's able to financially support that family as well."

¶ 30       This appeal followed.

¶ 31                              II. ANALYSIS

¶ 32       Defendant appeals, arguing (1) the trial court should have granted his motion to suppress because the police prolonged the traffic stop beyond the time necessary to complete the mission of the stop, (2) the trial court's sentence was an abuse of discretion, and (3) the trial court "imposed a trial tax." We address these issues in turn.

¶ 33                         A. The Motion To Suppress

¶ 34       Defendant argues that the trial court should have granted his motion to suppress because the police prolonged the traffic stop beyond the time necessary to complete the mission of the stop. We disagree.

¶ 35                          1. *The Applicable Law*

¶ 36       Both the United States Constitution and the Illinois Constitution proscribe unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. A traffic

- 15 -

stop entails the seizure of the driver. *People v. Harris*, 228 Ill. 2d 222, 231, 886 N.E.2d 947, 954 (2008). In determining whether a traffic stop was an unreasonable seizure, a court must consider the following questions: (1) Was the initial traffic stop lawful? (2) Assuming the initial stop to be lawful, was the stop prolonged beyond the time necessary to complete the mission of the stop? (3) Assuming it was so prolonged, was the continued detention of the defendant supported by a reasonable suspicion? *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 56.

¶ 37    In this case, defendant concedes that the initial traffic stop was valid. Furthermore, the State does not argue that the police had reasonable suspicion to justify the continued detention of defendant. Accordingly, the sole issue is whether the stop was unreasonably prolonged beyond the time necessary to complete the mission of the stop. See *id.* ¶ 56.

¶ 38    In determining whether a stop was impermissibly prolonged, a court "must first decide when the stop began." (Internal quotation marks omitted.) *Id.* ¶ 63. "A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). "Generally, a [valid] traffic stop ends when the paperwork of the driver and any passengers has been returned to them and the purpose of the stop has been resolved." *People v. Leach*, 2011 IL App (4th) 100542, ¶ 12, 959 N.E.2d 680.

¶ 39    A traffic stop has been prolonged beyond the time necessary to complete the mission of the stop "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1614 (2015). "[A] traffic stop prolonged beyond that point is unlawful." (Internal quotation marks omitted.) *Id.* at ___, 135 S. Ct. at 1615. "A traffic stop is analogous to a *Terry* stop, and its permissible duration is determined by the seizure's mission." *People v. Cummings*, 2016 IL 115769, ¶ 13, 46

N.E.3d 248 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). The seizure's mission includes (1) addressing the traffic violation that warranted the stop and (2) related safety concerns. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614. "In a traffic stop, the officer's mission is to check the driver's license, find out if there are any warrants against the driver, inspect the automobile's registration and proof of insurance, and decide whether to issue a ticket." *People v. Thomas*, 2018 IL App (4th) 170440, ¶ 68, 115 N.E.3d 325.

¶ 40        "An officer's inquires into matters unrelated to the justification for the traffic stop *** do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333; see also *People v. Litwin*, 2015 IL App (3d) 140429, ¶ 36, 40 N.E.3d 784. "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop" but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615. "The critical question, then, is not whether [a matter unrelated to the traffic stop] occurs before or after the officer issues a ticket *** but whether conducting [those activities] prolongs—*i.e.*, adds time to—the stop ***." (Internal quotation marks omitted.) *Id.* at 1616. Accordingly, there is a "bright line against prolonging a stop with inquiries outside the mission of a traffic stop, unless an officer has reasonable suspicion for those inquiries." *Cummings*, 2016 IL 115769, ¶ 7; see also David J. Robinson, *A Sniff Too Far: No Dog Sniffs After Completed Traffic Stops*, 103 Ill. B.J. 42, 45 (2015). If the traffic stop has been prolonged, a defendant's subsequent consent to a search may be "tainted" by the unlawful detention. *People v. Al Burei*, 404 Ill. App. 3d 558, 566, 937 N.E.2d 297, 304 (2010).

¶ 41        "Determination of whether a traffic stop was unduly prolonged requires an

analysis of a totality of the circumstances." *People v. Reedy*, 2015 IL App (3d) 130955, ¶ 27, 39 N.E.3d 318; see also *People v. Baldwin*, 388 Ill. App. 3d 1028, 1034, 904 N.E.2d 1193, 1199 (2009). "Among the circumstances considered are the brevity of the stop and whether the police acted diligently during the stop." *Reedy*, 2015 IL App (3d) 130955, ¶ 27. Courts also consider "the nature of the offense and the ordinary inquiries incident to the stop." *People v. Wofford*, 2012 IL App (5th) 100138, ¶ 27, 969 N.E.2d 383. If the stop was prolonged, the continued detention of the defendant may be justified "if the officer discovers specific, articulable facts which give rise to a reasonable suspicion that the defendant has committed, or is about to commit, a crime." (Internal quotation marks omitted.) *Baldwin*, 388 Ill. App. 3d at 1035; see also *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615.

¶ 42       In *People v. Pulido*, 2017 IL App (3d) 150215, ¶ 14, 83 N.E.3d 1111, Trooper Korando pulled over the defendant's vehicle for speeding. While Korando was speaking with the defendant, Trooper Degraff arrived on the scene with Rico—his drug-sniffing canine. *Id.* ¶ 15. While Korando spoke with the defendant and addressed matters related to the traffic stop, Degraff conducted a free air sniff with his canine. *Id.* ¶ 17. As a result of the free air sniff, methamphetamine was eventually found inside of the defendant's vehicle. *Id.* ¶ 26. Although his conviction was reversed on other grounds, the Third District concluded that "[b]ecause the sniff occurred while Korando was still performing the duties related to the initial purpose of the stop, we find the sniff did not impermissibly prolong the encounter." *Id.* ¶ 38. In reaching this conclusion, the court reasoned as follows:

> "Here, Korando pulled defendant over for speeding. After obtaining defendant's information, Korando and defendant returned to Korando's squad car so that Korando could run the information through LEADS and write defendant a

warning. Before Korando finished writing defendant a warning and receiving the confirmation from LEADS, Degraff arrived on the scene and conducted the free-air sniff. After Rico alerted on the vehicle, Korando was informed by radio that defendant's LEADS check was clear. A free-air sniff conducted during a lawful traffic stop does not violate the fourth amendment, as long as it is done, as it was here, within the time reasonably required to complete the mission of the initial traffic stop." *Id.* ¶ 41.

¶ 43                                    2. *The Standard of Review*

¶ 44        When reviewing a motion to suppress, the appellate court applies a bifurcated standard of review. *Sadeq*, 2018 IL App (4th) 160105, ¶ 49. The trial court's findings of fact are entitled to great deference, and a reviewing court will reverse those findings only if they are against the manifest weight of the evidence. *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 8, 98 N.E.3d 420. The ultimate decision of whether the evidence should be suppressed, however, is reviewed *de novo*. *People v. West*, 2017 IL App (3d) 130802, ¶ 19, 76 N.E.3d 60.

¶ 45                                        3. *This Case*

¶ 46        At the suppression hearing, Officer Klein stated that he pulled over defendant's taxicab at approximately 2:10 p.m. Klein noted that he had to (1) obtain identification from defendant and his passenger, (2) check whether defendant had a valid driver's license, (3) check whether defendant had car insurance, (4) determine whether there were any active warrants for defendant or his passenger, and (5) fill out paperwork related to the traffic stop. Klein stated that while he was performing these activities, Officer Johnson arrived on the scene at approximately 2:18 p.m. Klein testified that he did not assist Johnson until he saw him place defendant under arrest—which was at approximately 2:20 p.m. Klein confirmed that prior to assisting with the

arrest, he was "just doing paperwork" which was related to the traffic stop. Klein clarified that he "hadn't even fully completed the written warning" when defendant was placed under arrest.

¶ 47 Johnson testified that, at approximately 2:19 p.m., he searched defendant's person. Johnson stated that Klein was "[s]till in the driver's seat of his squad car" and was doing "paperwork" during the search. Johnson stated that Klein was not assisting "in any form or fashion" until defendant was placed under arrest. Johnson stated that he arrested defendant at approximately 2:20 p.m.

¶ 48 Based upon this record and the trial court's findings, we conclude that the officers did not prolong the stop beyond the time necessary to complete the mission of the stop. See *Pulido*, 2017 IL App (3d) 150215, ¶ 41 (concluding the stop was not prolonged when one officer worked only on matters related to the traffic stop while another officer conducted a "free-air" sniff).

¶ 49 The stop began at approximately 2:10 p.m. when Klein pulled over defendant's vehicle. At approximately 2:19 p.m., Klein was diligently working on matters related to the traffic stop while Johnson questioned and searched defendant. The record contains no evidence to suggest that Klein delayed or otherwise hindered his efforts so that other officers could investigate matters unrelated to the traffic stop. Moreover, at the time that Johnson searched defendant, Klein was still carefully working on matters related to the traffic stop while in his squad car. Thus, we conclude that the police did not prolong the stop because (1) the tasks tied to the traffic infraction were not completed at the time of the search and (2) the search was conducted within the time reasonably required to complete the mission of the initial traffic stop. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1616; *Pulido*, 2017 IL App (3d) 150215, ¶ 41. Accordingly, we affirm the trial court's denial of defendant's motion to suppress.

¶ 50                              B. Defendant's Sentence

¶ 51          Defendant next argues that the trial court's sentence was an abuse of discretion. Specifically, although he concedes that his sentence was within the statutory framework provided by the legislature, defendant argues that "the judge employed a personal sentencing policy in the guise of deterrence, he misinterpreted two mitigating factors as aggravating, [and] there was no evidence that this particular offense resulted in harm to anyone aside from himself[.]" We disagree.

¶ 52                              1. *The Applicable Law*

¶ 53          "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "The trial court has broad discretionary powers when selecting an appropriate sentence." *People v. Garcia*, 2018 IL App (4th) 170339, ¶ 37, 99 N.E.3d 571.

¶ 54          The Unified Code of Corrections (Unified Code) (730 ILCS 5/1-1-1 *et seq.* (West 2016)) sets forth mitigating and aggravating factors that the trial court must consider when determining an appropriate sentence. *People v. Brunner*, 2012 IL App (4th) 100708, ¶¶ 43-45, 976 N.E.2d 27. A defendant's "history of prior delinquency or criminal activity" and the need "to deter others from committing the same crime" are aggravating factors. 730 ILCS 5/5-5-3.2(a)(3), (7) (West 2016). It is a mitigating factor if a "defendant's criminal conduct neither caused nor threatened serious physical harm to another." *Id.* § 5-5-3.1(a)(1). Likewise, it is a mitigating factor if "[t]he imprisonment of the defendant would entail excessive hardship to his dependents." *Id.* § 5-5-3.1(a)(11).

¶ 55          A trial court abuses its discretion when it considers an improper factor in aggravation. *People v. Minter*, 2015 IL App (1st) 120958, ¶ 147, 37 N.E.3d 238. Likewise, the

trial court may not have a personal sentencing policy that fails to conform to the standards of the Unified Code. See *People v. Bolyard*, 61 Ill. 2d 583, 586-87, 338 N.E.2d 168, 169-70 (1975); *People v. Clemons*, 175 Ill. App. 3d 7, 13, 529 N.E.2d 577, 581 (1988). Whether the trial court relied upon an improper factor during sentencing is a question of law reviewed *de novo*. *People v. Arbuckle*, 2016 IL App (3d) 121014-B, ¶ 39, 60 N.E.3d 185. Nonetheless, there is a strong presumption that the trial court's sentence was based on proper legal reasoning, and a reviewing court should consider the record as a whole rather than a few isolated statements. *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22, 979 N.E.2d 1014. A defendant bears the burden to affirmatively establish that his sentence was based on an improper factor. *People v. Williams*, 2018 IL App (4th) 150759, ¶ 18, 99 N.E.3d 590.

¶ 56        "The weight to be given to any *proper* factor, however, is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." (Emphasis in original.) *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 104. The appellate court may not substitute its judgment for that of the trial court merely because it would have weighed these factors differently. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11, 65 N.E.3d 419. Further, a reviewing court presumes that a sentence imposed within the statutory range provided by the legislature is proper. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. A trial court's sentence is an abuse of discretion if it is greatly at odds with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Geiger*, 2012 IL 113181, ¶ 27, 978 N.E.2d 1061. The trial court's sentence is entitled to "great deference because the trial court is in the best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15, 82 N.E.3d 693.

¶ 57                                           2. *This Case*

¶ 58          Defendant was convicted of unlawful possession of a controlled substance in that he knowingly and unlawfully possessed more than 15 grams but less than 100 grams of a substance containing cocaine. 720 ILCS 570/402(a)(2)(A) (West 2014). The parties agree—both before the trial court and this court—that defendant's permissible sentence ranged from a 6-year minimum to a 30-year maximum. 730 ILCS 5/5-5-3.2(b)(1) (West 2016). At trial, the State recommended a 20-year sentence while defense counsel requested a sentence "in the range" of 6 to 10 years. The trial court, after carefully considering defendant's rehabilitative potential and his prior criminal history, sentenced defendant to 16 years in prison.

¶ 59          Defendant argues that there was "overwhelming" mitigating evidence. Specifically, defendant argues that he "purchased cocaine for himself to feed an addiction" and that his actions did not harm others. See *id.* § 5-5-3.1(a)(1) (it is a mitigating factor if a "defendant's criminal conduct neither caused nor threatened serious physical harm to another"). Likewise, defendant argues that his sentence would cause hardship to his dependents. See *id.* § 5-5-3.1(a)(11) (it is a mitigating factor if "imprisonment of the defendant would entail excessive hardship to his dependents"). However, the trial court found that the following aggravating factors existed: (1) defendant's prior criminal history and (2) the need to deter others. *Id.* § 5-5-3.2(a)(3), (7). This court may not substitute its judgment for that of the trial court merely because we *could have* weighed these factors differently. *Wilson*, 2016 IL App (1st) 141063, ¶ 11.

¶ 60          Likewise, defendant essentially argues that his drug addiction is a mitigating factor because he committed the offense to "feed an addiction" and that no one else was hurt by his actions. However, "[u]nder the Unified Code, drug addiction is not an explicit factor in mitigation or aggravation." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 105; see also 730 ILCS 5/5-

5-3.1, 5-5-3.2 (West 2016). Accordingly, "the trial court is not required to view drug addiction as a mitigating factor." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 105; see also *People v. Madej*, 177 Ill. 2d 116, 139, 685 N.E.2d 908, 920 (1997). "Instead, a history of substance abuse is a 'double-edged sword' that the trial court may view as a mitigating or aggravating factor." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 105 (quoting *People v. Mertz*, 218 Ill. 2d 1, 83, 842 N.E.2d 618, 662 (2005)). To that point, "the court could have properly concluded that defendant's drug addiction lessened his rehabilitative potential, increased the seriousness of the offense, increased the need to protect society, and increased the need for deterrence." *Id*. ¶ 108. Accordingly, this argument fails to demonstrate that the trial court abused its discretion.

¶ 61        Defendant further argues that the trial court "had a policy of imposing a longer sentence each time a defendant was convicted, notwithstanding other factors such as the nature of the offense and other factors in a defendant's life." This argument is based upon the following portion of the record:

> "But with your previous criminal history and the fact that you have been to prison not just on two previous occasions but for fairly lengthy periods of time, 12 years on the first offense in '97, and then 10 years on the second offense arising out of the incident in 2007. And so, when someone appears in court again for a serious felony, that, to me, is one of the reasons why the Court is allowed to look at one's history of prior delinquency and criminal activity, and also to look at whether or not a sentence is necessary to deter others from committing the same type of a crime, which is [why] there needs to be increasing responsibility. There needs to be an increase in the punishment which is imposed because if there's not an increase in general, *not all the time*, then one is rewarded for their behavior. Not

only is one rewarded for their bad behavior but the message that is sent to others is not one of deterrence, it is one of roll the dice because good things might and/or could happen to you so long as you take responsibility for your actions. So I'm saying it's a balancing act." (Emphasis added.)

¶ 62 When the trial court's statements are viewed within the proper context, we conclude that the trial court did not have an impermissible sentencing policy. See *People v. Scott*, 2015 IL App (4th) 130222, ¶¶ 48-49, 25 N.E.3d 1257 (the trial court's statement that a minimum sentence " 'is basically reserved for individuals who either haven't been to the Department of Corrections' " or who " 'don't have as much of a previous criminal history as [the defendant]' " was not an improper sentencing policy. (Emphasis omitted.) Instead, when the statements were viewed in the proper context, the trial court "was merely commenting on the effect of defendant's criminal history—a factor explicitly listed in the Unified Code of Corrections as a potential reason for extending a defendant's sentence."). Here, as the Unified Code allows, the court was properly taking into account defendant's prior criminal history and the need for deterrence. 730 ILCS 5/5-5-3.2(a)(3), (7) (West 2016); see also *Scott*, 2015 IL App (4th) 130222, ¶¶ 48-49.

¶ 63 Defendant also argues that the trial court "misinterpreted" his statement of allocution to his "detriment." In his statement of allocution, defendant stated that he was "truly good" to his family and supported his children "first and foremost." However, defendant conceded that the rest of his money "went to [his] habits and addictions" and that his "savings, tips, and extra money" were used to purchase drugs. He stated that he had "sinned against [his] family" and that he had been "away from [his family] without being able to provide for them, provide for them [with] overall love and support." Defendant's presentence report stated that

defendant "does not seem to contribute financially to support his family as he indicates his paychecks are often spent on illicit substances."

¶ 64 When sentencing defendant, the trial court began by commending defendant for "thinking about *** how your actions have had an impact not only upon your own life but the life of your family in particular[.]" The court stated that by defendant's "own admission, at least for the last several years when you were full-time employed, it was your wife who was supporting financially the family's needs and expenses while you were taking the money that you were earning and selfishly spending it on yourself." We note that based on defendant's drug addiction and the presentence report, the court's statement is supported by the record. Regardless, defendant fails to demonstrate that the trial court's sentence was an abuse of discretion based on this isolated statement.

¶ 65 In sum, we conclude that the trial court's sentence was not an abuse of discretion. First, we presume that defendant's sentence is proper because it was within the statutory framework provided by the legislature. See *Charleston*, 2018 IL App (1st) 161323, ¶ 16; 720 ILCS 570/402(a)(2)(A) (West 2014). Second, the trial court—rather than this court—was in the "best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Etherton*, 2017 IL App (5th) 140427, ¶ 15. To that point, the trial court carefully considered defendant's rehabilitative potential and weighed this against his past criminal history. Third, the trial court's imposition of a 16-year sentence was not greatly at odds with "the spirit and purpose of the law" nor was it manifestly disproportionate to the nature of the offense. *Sturgeon*, 2019 IL App (4th) 170035, ¶ 104. Finally, when the record is reviewed as a whole, defendant fails to demonstrate that the trial court relied upon an improper aggravating factor or that the court had an improper personal sentencing policy. See *Canizalez-*

*Cardena*, 2012 IL App (4th) 110720, ¶ 22; *Scott*, 2015 IL App (4th) 130222, ¶¶ 48-49.

¶ 66                                 C. The "Trial Tax"

¶ 67        Last, defendant argues that the trial court imposed a "trial tax" when defendant rejected the State's plea offer and proceeded to a stipulated bench trial. Specifically, defendant notes that the State "was willing to recommend a 13-year sentence in exchange for a plea to the higher class felony of possession with intent to deliver, but requested a 20-year sentence after dropping the more serious charge and proceeding on the simple possession charge by way of a stipulated bench trial[.]" Defendant argues that even though "the trial court did not explicitly approve of this plea agreement before it was rejected, the court gave no indication that it felt thirteen years of imprisonment *for a greater felony* was an inappropriate sentence. In fact, it conveyed the message that the agreement would be approved[.]" (Emphasis in original.) Accordingly, defendant argues that the "three year increase in the sentence imposed for a *lower class felony* after a stipulated bench trial *** is strong evidence that the court imposed a trial tax." (Emphasis in original.) We reject defendant's argument.

¶ 68                                 1. *The Applicable Law*

¶ 69        "A trial court may not punish a defendant for exercising his right to a trial." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 113. However, it must be "clearly evident" that a harsher sentence resulted from a defendant's demand for a trial. *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26. "This evidence can come when a trial court makes explicit remarks concerning the harsher sentence [citations], or where the actual sentence is outrageously higher than the one offered during plea negotiations [citation]." *Id.* Nevertheless, "the mere fact that the defendant was given a greater sentence than that offered during plea bargaining does not, in and of itself, support an inference that the greater sentence was imposed as a punishment for

- 27 -

demanding trial." *People v. Carroll*, 260 Ill. App. 3d 319, 348, 631 N.E.2d 1155, 1174 (1992). "In determining whether it is clearly evident that a harsher sentence resulted from a defendant's demand for a trial, the appellate court considers the record as a whole instead of focusing on isolated statements made by the trial court." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 113.

¶ 70 In *People v. Johnson*, 2018 IL App (1st) 153634, ¶ 19, 107 N.E.3d 333, the defendant rejected a 13-year plea offer and was ultimately sentenced to 16 years in prison. On appeal, the defendant argued that the trial court "punished" him for rejecting the plea offer and exercising his right to a trial. *Id.* ¶ 17. The First District rejected this argument and reasoned as follows:

> "The 16-year sentence is not markedly longer than the rejected 13-year offer. So this is not a case like *People v. Dennis*, 28 Ill. App. 3d 74, 78[, 328 N.E.2d 135] (1975), where the defendant rejected an offer of 2 to 6 years and received a sentence of 40 to 80 years after trial and 'there [was] nothing in the record to indicate why the court found appropriate the imposition of an extremely harsh sentence after [Dennis's] jury trial.' The *Dennis* court, which based its ruling on the disparity and the absence of justification, limited its holding to its unusual facts. *Id.*
>
> Nor is this a case like *People v. Young*, 20 Ill. App. 3d 891, 894[, 314 N.E.2d 280] (1974), where the defendant rejected a two- to five-year offer and was sentenced to three to nine years of imprisonment, which the trial court justified by stating, ' "you shot the dice and they just came up craps." ' Or *People v. Moriarty*, 25 Ill. 2d 565, 567[, 185 N.E.2d 688] (1962), where the trial judge

- 28 -

linked the increased sentence to the rejected offer by stating that the defendant's rejection of a plea deal ' "will cost you nine years additional.' "

Here, the trial court stated that the additional detail heard at trial, pertaining to the 'planned nature' of the crime, justified the increase. Johnson contends this statement is pretextual, and the State's proffer during the Rule 402 conference and the trial evidence were essentially identical. But the State's bare-bones description of the crime did not include evidence of premeditation. The trial evidence (including Johnson's statement to police and the surveillance video) illuminated that this armed robbery was not a spur-of-the-moment decision but, rather, a planned escapade where each participant had a defined role. On this record, it is not 'clearly evident' that the 16-year sentence in any way served as punishment for rejection of the plea offer." *Id.* ¶¶ 19-21.

¶ 71　　In *Sturgeon*, 2019 IL App (4th) 170035, ¶ 116, the defendant rejected a plea offer that included a 25-year prison sentence. During a Rule 402 (Ill. S. Ct. 402 (eff. July 1, 2012)) conference, the trial court stated that, based on the defendant's criminal history and nature of the charges, it was " 'more inclined to sentence [defendant] in the extended term range of at least 30 years, if not more.' " *Id.* Ultimately, defendant rejected the plea offer and the trial court sentenced him to 45 years in prison after he was found guilty at his trial. *Id.* On appeal, the defendant argued that the trial court "improperly punished" him for proceeding to trial. *Id.* ¶ 111. This court disagreed, concluding that it was not clearly evident that the court imposed a harsher sentence because (1) "[t]he phrase 'if not more' certainly includes the trial court's ultimate sentence of 45 years" and (2) the defendant failed "to cite to any other statement which could establish that the trial court punished him for exercising his right to a trial." *Id.* ¶ 117.

¶ 72    In *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 6, the State made the defendant a plea offer which included a 38-year prison sentence. Defendant rejected this offer and proceeded to trial. *Id.* After the jury found him guilty, the trial court sentenced defendant to a 90-year prison sentence. *Id.* ¶ 30. On appeal, the defendant argued that " '[i]f the State thought that a [*de facto*] life sentence was necessary to protect the public, it would not have offered to accept a plea in exchange for a 38-year sentence.' " *Id.* ¶ 50. This court, noting the difficulties and uncertainties associated with proceeding to trial, concluded that "it was entirely appropriate for the State to first offer a 38-year sentence during plea negotiations and then to later request a 90-year sentence following defendant's conviction at trial." *Id.* ¶ 52; see also *Brady v. United States*, 397 U.S. 742, 752 (1970) (noting that guilty pleas are "motivated at least in part by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury").

¶ 73                              2. *This Case*

¶ 74    In this case, the State and defense counsel presented the trial court with a proposed plea agreement. Pursuant to this proposed agreement, defendant would (1) plead guilty to count I (unlawful possession with intent to deliver), (2) receive a 13-year prison sentence, (3) receive credit for 525 days he had spent in pretrial custody, and (4) pay a $2000 fine. Further, the State would have dismissed count II (unlawful possession of a controlled substance). Defendant rejected the proposed agreement and proceeded to trial.

¶ 75    In October 2016, the trial court conducted a stipulated bench trial. The State dismissed count I (unlawful possession with intent to deliver) and proceeded on count II (unlawful possession). 720 ILCS 570/401(a)(2)(A), 402(a)(2)(A) (West 2014). The State and defendant agreed to an evidence stipulation, although defendant did not concede that this

stipulation would be sufficient to find him guilty beyond a reasonable doubt. Following this stipulation, the court found defendant guilty of count II (unlawful possession of a controlled substance). *Id.* § 402(a)(2)(A). The court later sentenced defendant to 16 years in prison.

¶ 76 We view this case as strikingly similar to *Johnson*, 2018 IL App (1st) 153634, ¶¶ 19-21, and conclude that defendant's "16-year sentence is not markedly longer than the rejected 13-year offer[.]" Further, "it is not 'clearly evident' that the 16-year sentence in any way served as punishment for rejection of the plea offer." *Id.* ¶ 21. Defendant also fails to cite to any statement in the record that could indicate that the trial court punished him for rejecting the offer and proceeding to trial. See *Sturgeon*, 2019 IL App (4th) 170035, ¶ 117. Finally, there was nothing improper about the State offering a 13-year prison sentence during plea negotiations and later requesting a 20-year sentence following a stipulated bench trial. *Wheeler*, 2019 IL App (4th) 160937, ¶ 52. Accordingly, we conclude that it is not "clearly evident" that the trial court punished defendant for rejecting a plea agreement and proceeding to trial. *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26.

¶ 77 3. *The "Trial Tax" and the "Pre-Flight Checklist"*

¶ 78 We are aware that this court recently suggested that trial courts should go through a "preflight checklist" in felony cases before starting a trial. See *People v. Williams*, 2016 IL App (4th) 140502, ¶¶ 35-39, 54 N.E.3d 934. When doing so, a trial court, of necessity, needs to be informed by the parties of any plea offers made by the State in order to ensure that any such offer was in fact communicated to the defendant personally. However, given our earlier discussion about plea bargaining, we see no reason why a trial court should give *any* consideration to the State's plea offer when (1) the defendant has rejected that offer and (2) the court is called upon to sentence the defendant after he has been convicted at trial.

¶ 79        For an explanation of the policy as to why this is so, a discussion of settlement negotiations in a civil case might prove helpful.

¶ 80                      a. The Claim of a "Trial Tax" in Civil Cases

¶ 81        Imagine a medical malpractice case in which the plaintiff asserts that she was seriously injured because defendant hospital's medical staff breached the appropriate standard of care when treating her.

¶ 82        The parties aren't able to settle, and before the case goes to jury trial, plaintiff's last demand was $600,000, and the hospital's last offer was $200,000. The parties inform the trial court of their respective last positions.

¶ 83        At trial, plaintiff argues the jury should award her damages of $1,000,000, and the jury ultimately agrees. The hospital files a post-trial motion for remittitur, arguing that the damages are excessive and should be reduced to $600,000, claiming that plaintiff's $600,000 demand obviously represents all that plaintiff thought the case was worth because plaintiff was willing to settle for that amount before trial. Further, the hospital argues that it had a right to trial on the contested issue of liability, and if the court permitted the $1,000,000 award to stand, doing so would amount to an improper "trial tax" on the hospital's exercise of its right to trial.

¶ 84        The obvious flaw in the hospital's argument is its claim that plaintiff's $600,000 demand to settle represented "what plaintiff really thought the case was worth." Instead, that figure represented what plaintiff was willing to accept *without the risk of going to trial and perhaps getting nothing*. Plaintiff's willingness to settle the case for $600,000 before trial represented plaintiff's real-world assessment that certainty about what a jury will do does not exist.

¶ 85                  b. The Claim of a "Trial Tax" in Criminal Cases

¶ 86    The above analysis applies to criminal cases as well as civil cases *as long as* the trial court is not involved in the plea bargaining process. (And, we add, the trial court *should not* be involved in the plea bargaining process. See *Sturgeon*, 2019 IL App (4th) 170035, ¶ 118 ("Rule 402(d) *permits* but does not *require* trial courts to engage in such conferences, and many experienced trial judges refuse to engage in such conferences because those judges deem them both unseemly and unnecessary." (Emphases in original.))).

¶ 87    In a criminal case, the State is the plaintiff, occupying a position similar to the civil plaintiff in the medical malpractice action. The default position in a criminal case, just like in a civil case, is for the matter to be resolved by trial, either before a jury or the court. However, in the overwhelming majority of criminal cases (just like in civil cases), the parties engage in negotiations to see if an agreement can be reached short of a trial.

¶ 88    Thus, imagine a criminal case in which the defendant is charged with armed robbery (a non-probationable Class X felony carrying a sentencing range of 6 to 30 years). The State might agree to a sentence of 12 years if the defendant pleads guilty, based upon the prosecutor's belief that the State's case may not contain enough persuasive evidence of defendant's guilt to overcome his family's alibi testimony. When making this offer to the defendant, the State is aware of his three prior felony convictions and that if the defendant is convicted, the State will seek—and the court may likely impose—a much greater sentence.

¶ 89    Assume that the defendant is fully aware of these same concerns and has discussed the matter with his counsel. After doing so, the defendant turns down the State's offer, and the case goes to trial.

¶ 90    The jury disbelieves the defendant's alibi witnesses and concludes that the State has proved the defendant guilty beyond a reasonable doubt. At the sentencing hearing, the trial

court learns of the defendant's three prior felony convictions, and the prosecutor asks the court to impose a sentence of 28 years.

¶ 91        Defense counsel objects, arguing that the State's recommendation is punitive and unfair, especially given that the State in its plea bargaining had earlier indicated that this crime was worth only a 12-year sentence. Defense counsel further argues that the defendant had the right to a jury trial to determine whether the State could meet its burden of proof, and if the trial court were to impose the 28-year sentence the State asks for, doing so would amount to an improper "trial tax" on the defendant's exercise of his right to trial.

¶ 92        Is this argument any different from the hospital's argument in the civil case described earlier? Or does it have any more merit? The answer to both of these questions is emphatically no.

¶ 93        A trial court's deeming the prosecutor's argument for a greater sentence after trial as a "trial tax" is clearly wrong. The prosecutor during plea negotiations is merely offering to settle the case for what the prosecutor thinks is the least he or she can accept, given, among other factors, the strength of the State's case and the defendant's record. The prosecutor's asking for a greater sentence after trial is no more a "trial tax" than is the jury's award of $1,000,000 in damages in the medical malpractice case after the hospital turned down the plaintiff's $600,000 offer to settle.

¶ 94                                    III. CONCLUSION

¶ 95        For the reasons stated, we affirm defendant's conviction. As a part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002(a) (West 2016).

¶ 96        Affirmed.

¶ 97    JUSTICE TURNER, specially concurring.

¶ 98    Although I agree this court should affirm the trial court's judgment, I write separately to express my unwillingness to participate in paragraphs 77 through 93 of the majority's opinion. I find the discussion in those paragraphs unnecessary given the majority's analysis in paragraphs 68 through 76.