2022 IL App (1st) 200715-U

No. 1-20-0715

Order filed December 2, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 19400 |
| | ) | |
| STEVON BROWNER, | ) | Honorable |
| | ) | William H. Hooks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court.
Presiding Justice McBride and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's sentence is affirmed where the trial court (1) considered all mitigating evidence, and (2) did not commit plain error by relying on improper factors.

¶ 2    Following a bench trial, defendant Stevon Browner, age 19, was found guilty of two counts of attempted first degree murder, one count of aggravated battery, and one count of aggravated discharge of a firearm. The court merged all counts into one count of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)) and imposed 40 years' imprisonment. On appeal,

defendant argues that the court (1) failed to adequately consider mitigating factors and (2) committed plain error by considering improper factors. We affirm.

¶ 3     Defendant was charged by indictment with multiple offenses arising from an incident on October 9, 2014. The State proceeded to trial on counts of attempted first degree murder of Alexus Hightower while armed with a firearm (count I), personally discharging a firearm (count II), causing great bodily harm by personally discharging a firearm (count III), and causing permanent disfigurement by personally discharging a firearm (count IV); attempted first degree murder of Hightower's daughter, also named Alexus Hightower[1] (counts IX-X); aggravated battery with a firearm against Hightower (count XI), and aggravated discharge of a firearm at a vehicle occupied by Hightower (count XII) and Alexus (count XV).

¶ 4     At trial, Hightower testified that on October 9, 2014, around 6 p.m., she left a laundromat with Kevin Humes, Kelvin Littles, and Alexus. Humes drove Hightower's vehicle, and Hightower sat in the front passenger seat; Littles sat behind Hightower, and Alexus was in a child seat behind Humes. As they drove up Paulina Street to Juneway Terrace, Hightower observed her friend, "Bucky." Humes pulled into an alley so Bucky and Hightower could speak through a window. An individual Hightower knew as "Dirty" entered the alley.

¶ 5     Dirty said something to Humes which "made [Hightower] feel nervous and uncomfortable." Fearing for Alexus's safety, she asked Humes to leave the alley. After proceeding about 1½ blocks, Hightower observed defendant, whom she identified in court, standing near Ashland Avenue. Hightower had known defendant, "Taz," since he was a child, and had grown up with his family. Defendant also had been to her on home numerous occasions.

_____

[1] We will refer to Alexus Hightower as Hightower and her daughter as Alexus.

¶ 6 Defendant stood 7 to 10 feet from Hightower and held a firearm. She tried saying, "no, my baby," but defendant bit his bottom lip, lifted his arm, and shot at the vehicle. Hightower was closest to defendant and he pointed his firearm at her when he began shooting. One shot hit the "motion box" under the vehicle, causing it to start "floating." Hightower reached for Alexus and was shot in the back. After the vehicle stopped, Hightower jumped out, asked Humes to grab Alexus, and walked to the corner to call the police. Alexus was uninjured.

¶ 7 Hightower was transported by ambulance to St. Francis Hospital. A bullet was removed from her back, and another in her hip was stopped by a key in her pocket. At the hospital, Hightower told police that Taz shot her. On October 14, 2014, she emailed photos of defendant to Chicago police detective Jose Gomez and told him that she did not know why defendant, a "close acquaintance," shot her. The next day, Hightower met with detectives, signed an advisory form, identified defendant as the shooter from a photo array, and gave a videotaped statement.

¶ 8 On cross-examination, Hightower testified that the vehicle had tinted windows in the back. Defendant fired 12 or 13 times, but no one chased or shot at her when she exited the vehicle. The bullet which hit her hip pierced the skin. She left the hospital that evening, against medical advice, because she received threats on her phone.

¶ 9 Humes testified that he drove Hightower and Littles on the evening of the incident, but denied being at the laundromat or that Alexus was with them. They pulled into the alley because of a vehicle crash, but Hightower told Humes to exit the alley soon after. Humes did not observe anyone in the alley. Humes "heard some shots," but testified that he "was at the wrong place at the wrong time."

¶ 10    Humes did not recall meeting with Gomez and Assistant State's Attorney Craig Taczy on October 15, 2014, or giving a video statement. He denied telling them that, in the alley, Bucky was on the driver's side of the vehicle, "by the baby." He never told them Dirty approached the vehicle, said something, and afterwards, Hightower asked them to leave. Humes testified that they did not have to back out of the alley because they were facing straight out and denied stating that, as they turned onto Ashland, Taz appeared from between two vehicles and shot Hightower twice. He denied saying the shooter was three to four feet away, observing the shooter's face, or saying the shooter wore a gray hoodie. Humes denied telling Gomez and Taczy there were 10 shots, the first shot hit the windshield, the second hit the engine, and the rest hit the vehicle, or that he retrieved Hightower's daughter. He denied telling them defendant had a "smoke gray pistol, 9-millimeter," instead testifying that he "couldn't see nothing" because he "ducked underneath the car."

¶ 11    The State produced People's Exhibit No. 20, a photo of defendant with Humes's signature, which is included in the record on appeal. Humes testified that he only signed the paper because "they asked" whether he knew the person in the photo, and he responded, "That's my son's uncle." Humes did not know the person's name.

¶ 12    Gomez testified that he and his partner, Detective Reyes,[2] interviewed Hightower at the hospital on October 9, 2014. Afterwards, Gomez visited the scene and observed Hightower's vehicle with seven gunshot holes in the passenger side and the hood. The windows were shattered. Eight 9-millimeter cartridges were collected, along with two bullet fragments from the rear passenger door and seat.

_____

[2] Detective Reyes's first name is not found in the report of proceedings.

¶ 13    Hightower called Gomez on October 14, 2014, because she wanted to email photos to him. The next day, Gomez met Hightower in Evanston. She signed an advisory form and identified defendant as the shooter from a photo array. Defendant was arrested that day. Also on October 15, 2014, Gomez and Taczy met Humes at the police station and he voluntarily gave a videotaped statement.

¶ 14    The State entered a stipulation regarding the foundation of the video, People's Exhibit No. 21.  The State offered the video into evidence and published the video, which is included in the record on appeal and has been reviewed by this court.

¶ 15    The video depicts Humes and two other men in an interrogation room. Humes confirms he is giving the statement voluntarily, and describes the events of October 9, 2014. Humes was with Hightower, Littles, and Alexus at a laundromat. They left around 6 p.m.; Humes drove, Hightower was in the passenger seat, Littles sat behind Hightower, and Alexus sat behind Humes. Hightower observed Bucky, and Humes entered an alley so they could speak. Bucky asked Hightower for a cigarette and played with Alexus through the window. An individual Humes knew as Dirty entered the alley and spoke to him.[3] Hightower then asked to leave because she felt threatened. Humes reversed the vehicle and heard shots near Ashland. The shooter was three to four feet from the passenger side.

¶ 16    When asked who the shooter was, Humes points at a photo and says, "I know him as Taz," but did not know his real name. Humes signs the photograph after making the identification. Taz wore a gray hoodie with the hood raised, but Humes stated that he still observed his face. There

---

[3] The State requested the court strike the portion of the video where Humes discusses Dirty's statement.

were at least 10 shots; the first hit the windshield, the second hit the motor, the third hit the front passenger window, and the rest hit the back passenger door. During the shooting, the vehicle kept moving. When it stopped, Humes exited and grabbed Alexus; Hightower called the police. Humes could no longer see the shooter, who had used a "smoke gray" pistol. Humes knew Taz since he was a baby.

¶ 17    Defense counsel moved for a directed finding. The court granted the motion as to counts III and IV for attempted first degree murder, finding that the State had not presented evidence that suggested great bodily harm or disfigurement to Hightower.

¶ 18    After closing arguments, the court found defendant guilty of attempted first degree murder of Hightower while armed with a firearm (count I) and personally discharging the firearm (count II), aggravated battery with a firearm against Hightower (count XI), and aggravated discharge of a firearm at a vehicle occupied by Hightower (count XII). The court found defendant not guilty of attempted first degree murder of Alexus (counts IX and X) and aggravated discharge of a firearm at a vehicle occupied by Alexus (count XV).

¶ 19    Defendant filed a motion and two amended motions for a new trial or, in the alternative, to reconsider. The court denied the motions.

¶ 20    The court ordered a presentence investigation (PSI) report, which was filed on April 2, 2019. Due to delays prior to sentencing, a second PSI was ordered and filed on January 7, 2020.

¶ 21    Defendant's PSIs reflected a pending case for public indecency (2017), convictions for possession of cannabis (2013) and possession of a stolen motor vehicle (2012), and a juvenile charge of retail theft (2009). He had been sentenced to one year's imprisonment for possession of cannabis and four years' imprisonment for possession of a stolen motor vehicle.

¶ 22 According to the PSI from January 7, 2020, defendant was 19 years old on the date of the shooting at issue. Defendant was raised by his mother, never knew his father, and had eight half-siblings. He was incarcerated during his sophomore year of high school, was never employed, and spent the five years prior to trial in the Cook County Department of Corrections. Defendant was single, had no children, and lived with his mother and youngest brother in Chicago prior to incarceration. He denied associating with a gang, though he reported he was a member of the Gangster Disciples in his prior PSI. Defendant took medication for high blood pressure, and was stabbed by another inmate in 2017. He smoked marijuana daily since age 12.

¶ 23 At sentencing, the State argued in aggravation that defendant caused lasting harm to Hightower when he shot at her and the other occupants of the vehicle, including her two-year-old child, at close range. The State emphasized defendant's criminal record, noting he was on parole when this incident occurred and that he failed to "rejoin society" and "be a law abiding citizen." Defendant had been sentenced to boot camp for his cannabis conviction, but was resentenced to one year of incarceration after violating the terms of his initial sentence. The State requested a prison term of 35 years.

¶ 24 In a letter, Hightower wrote that defendant "ruined me and my six kids's life, mentally and physically."[4] She felt stress and had trouble taking her children to activities. Due to fear, she moved out of state and away from everyone she had known her whole life. She experienced financial difficulty as she was unable to work because of her physical injuries and mental instability. She wrote that "for [defendant] to look at me and my 2-year-old child in the eye, and try to kill us, he had no remorse when he was behind that gun, pulling that trigger, shooting me."

---

[4] The letter is not included in the record on appeal, but was read into the record by the State.

¶ 25    In mitigation, defense counsel asserted that the State misrepresented whether defendant shot from close range or knew that Alexus was present. Counsel argued that defendant did not act "as call[ously] as described in the letter," was only 19 at the time of the incident, and his criminal background was nonviolent. Additionally, Hightower's injuries were minimal and there was no evidence she received surgery, rehabilitation, or counseling. Defendant had familial support throughout the trial and wanted to obtain his GED. Defense counsel requested the minimum prison sentence of 26 years, which would be "significant" but still offer defendant the chance "to become a better person, and to become a productive member of society." Defendant did not speak in allocation, though counsel stated that defendant asked counsel to thank the court for him.

¶ 26    The court merged all counts into count II for attempted first degree murder predicated on personally discharging the firearm at Hightower and imposed a sentence of 40 years' imprisonment.[5] The court stated that it was "mindful of the [s]entencing range in this matter," but noted that "these are not 50 percent cases."

¶ 27    In imposing sentence, the court noted "the horror" of defendant's conduct in "pumping a vehicle with .9 millimeter rounds," twice striking Hightower while she tried to "save her child." The offense, moreover, was not "incidental" or between strangers. Rather, defendant "knew the victim" and her family and "made a conscious decision" to "light up that vehicle." The court called defendant's actions the "epitome" of "attempt first degree murder," and noted the "psychological damage" to Hightower and "the broad community of Chicago, and Cook County" when people "cannot move about" or "live their lives without people like [defendant] trying to take those lives

---

[5] Prior to stating that "all the findings merge with Count II, same act, same crime," the court stated that defendant would receive sentences of 40 years, 30 years, and 30 years for counts I, XI, and XII, respectively. The mittimus lists the sentences for each count, but specifies the counts merge into count II.

away." According to the court, "[t]here is no reason why a young [m]other has to be put in peril, and the community we know as Chicago, and have to go through the horror of surviving being a stationary target of another individual."

¶ 28    The court described legitimate uses of firearms for law enforcement, the military, and sports, but stated that firearms should not be used "to alter the course of another person's life at a whim," as in the present case, when a person "decides to use" a firearm as "an instrument of evil." The court considered the argument that defendant was unaware of Alexus's presence to be "fantasy," and dismissed the notion that, if defendant knew "there was a 2-year-old in that seat, he would have been, *** more precise in shooting the [m]other." Defendant's lack of knowledge regarding Alexus's presence would not absolve him, however, because "that bullet goes where it goes; and it is reckless; and in this case it's intentional."

¶ 29    The court stated that the weight of the evidence regarding the shooting was "very significant," and declined "to entertain the fact that [Hightower] didn't die." Instead, she "was treated and released" after "a .9 millimeter bullet *** ripped through her flesh and *** caused her life to be altered forever." Although Hightower survived, the court had "no reason to doubt that the rest of her life will be affected by that." It added:

> "This Court is aware of Marines who have fought in combat; and I have been around those Marines; and I will tell you, that grown men who have been shot at in campaigns *** are still affected; and they're tough guys; and they signed up to for it; and they were willing to go out to die face down in the sand, if necessary, on behalf of this country; but they still are affected by it; and I know them close and personal.  They are still affected by it.

To be a civilian, to not be involved in a campaign, to have to go through this is extraordinary."

¶ 30    Finally, though defendant "may have" rehabilitative potential, the court found "[t]here was nothing presented for that" and he "has not accepted responsibility." The court stated, however, that defendant's failure to express remorse was not aggravating, and the best option was to place him in a situation where he could rehabilitate and "the community can be safe" from him. While defendant's prior crimes were not as severe as those committed by other offenders, he was "no stranger to the criminal justice system," and "[t]he test is, whether [defendant] needs to be amongst us, and whether we need to take a short-term trust of [defendant] to be rehabilitated in short order." The court added, however, that little could deter those "deciding whether they're going to shoot a woman in a car, with a baby in the back, even though they didn't know the baby was in the back, in the car seat."

¶ 31    Defense counsel filed two motions to reconsider sentence, arguing in relevant part that the sentence was excessive given "defendant's background and the nature of his participation in the offense." The court denied the motions.

¶ 32    On appeal, defendant contends that his sentence was excessive where the court disregarded his rehabilitative potential and the mitigating evidence, including defendant's youth, his non-violent prior offenses, his supportive family, and his desire to obtain his GED.

¶ 33    At sentencing, the trial court must balance "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The trial court has broad discretion when imposing a sentence, and its decisions are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). The reviewing court will not substitute

its judgment for that of the trial court merely because it would have weighed the factors differently. *Alexander*, 239 Ill. 2d at 213. The trial court is in the best position to evaluate the appropriate sentence because it observed the defendant and the proceedings. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50.

¶ 34 If a sentence is within the statutory limits, this court will not disturb it absent an abuse of discretion. *People v. Burton*, 2015 IL App (1st) 131600, ¶¶ 35-36. Abuse of discretion occurs when a sentence is "manifestly disproportionate to the nature of the offense." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). The presence of mitigating factors or an absence of aggravating factors does not mean that the minimum sentence must be imposed. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The most important factor in determining an appropriate sentence is the seriousness of the crime. *Quintana*, 332 Ill. App 3d at 109. A defendant's rehabilitative potential is only one factor to be considered by the trial court, and it is not entitled to more weight than any other factor. *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007). A trial court is not required to articulate every factor it considered to justify its sentence. *People v. Ramos*, 353 Ill. App. 3d 133, 137-38 (2004); see also *Evans*, 373 Ill. App. 3d at 968 (the trial court "is not required to detail precisely for the record the process by which [it] determined a sentence nor is [it] required to make an express finding that defendant lacked rehabilitative potential").

¶ 35 Generally, attempted first degree murder has a sentencing range of 6 to 30 years' imprisonment. 720 ILCS 5/8-4(c)(1) (West 2014) (sentence for attempted murder is the sentence for a Class X felony); 730 ILCS 5/5-4.5-25(a) (West 2014) (sentence for a Class X felony is 6 to 30 years' imprisonment). A 20-year enhancement applies, however, when, as here, the defendant personally discharged a firearm while committing attempted murder. 730 ILCS 5/8-4(c)(1)(C)

(West 2014). Consequently, the applicable range in this case was 26 to 50 years' imprisonment. Defendant was sentenced to 40 years' imprisonment, which falls within the statutory guidelines and is presumed to be proper unless the defendant affirmatively shows otherwise. *Burton*, 2015 IL App (1st) 131600, ¶ 36. Defendant did not make that showing here.

¶ 36    Viewing the record as a whole, the experienced trial court did not overlook defendant's rehabilitative potential or other mitigating factors. The court received defendant's PSIs, which reflected that he was 19 years old on the date of the offense and never knew his father. See *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 20 (sentencing court is presumed to consider all mitigating evidence presented including factors mentioned in PSI). Defense counsel argued that defendant's family supported him and that defendant wanted to obtain his GED. The PSIs, however, also showed that defendant used drugs daily, initially indicated gang affiliation, and had convictions for possession of cannabis and possession of a stolen motor vehicle. Further, as the State argued, defendant was on parole at the time of the incident and failed to "rejoin society" and "be a law abiding citizen"; instead, defendant repeatedly fired a weapon at an occupied vehicle.

¶ 37    The court was aware that Hightower's injuries did not preclude her from leaving the hospital, but declined "to entertain the fact that [Hightower] didn't die" as mitigation. Instead, the court properly considered the gravity of her injuries, the manner in which they "altered" her life, and the danger that defendant posed to the community. In so holding, the court acknowledged that defendant "may" have rehabilitative potential, but it was not proven by the mitigating evidence. The court explained that while defendant would have the opportunity to rehabilitate in prison, his sentence also needed to protect the community. As noted, rehabilitative potential is only one factor to be considered at sentencing (*Evans*, 373 Ill. App. 3d at 968), and the most important factor is

the seriousness of the crime (*Quintana*, 332 Ill. App. 3d at 109). Here, the court properly applied these principles, did not disregard the mitigating evidence, and exercised due discretion in fashioning defendant's sentence. See *Jones*, 2019 IL App (1st) 170478, ¶ 50. Defendant's sentence was not excessive and no error occurred.

¶ 38    In so holding, we observe that, for the first time on appeal, defendant cites several studies regarding the rehabilitative potential of young adults who have brains that are still developing, but no evidence was offered to show that this defendant had a brain that was still being developed.

¶ 39    Courts may take judicial notice of commonly known matters, "or of facts which, while not generally known, are readily verifiable from sources of indisputable accuracy." *People v. Mehlberg*, 249 Ill. App. 3d 499, 531 (1993). However, a reviewing court may not take judicial notice of "critical evidentiary material" not presented at trial. *Mehlberg*, 249 Ill. App 3d at 531. A reviewing court will determine the issues before it based only on the record made in the lower court. *Mehlberg*, 249 Ill. App 3d at 532. Here, defendant attempts to introduce evidence that was never introduced at trial or sentencing concerning the development of the brains of young adults. Therefore, this court will not consider it on appeal.

¶ 40    Defendant further argues that trial counsel was ineffective for not presenting "brain science" related to young adults, which prejudiced defendant at sentencing. The record here is insufficient to consider the claim on the merits, and, as a result, defendant's claim of ineffective assistance fails. See *People v. Richardson*, 401 Ill. App. 3d 45, 48 (2010) (ineffective assistance claims based on matters *de hors* the record are improper for direct appeal).

¶ 41    Next, defendant alleges the trial court erred at sentencing by (1) misapprehending trial evidence; (2) relying on factors inherent in the offense; (3) imposing a double enhancement; (4)

relying on factors unsupported by the evidence and, instead, drawing on the court's personal beliefs and experience; and (5) adhering to a "personal practice" for sentencing that disregarded the statutory range.

¶ 42    Defendant acknowledges that he did not preserve these issues for review, but requests that this court review them for plain error.

¶ 43    To preserve a claim of sentencing error, the defendant must contemporaneously object and file a written postsentencing motion raising an issue. *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010). When the defendant fails to preserve the issue, this court may review it under the plain error doctrine. *People v. Wooden*, 2014 IL App (1st) 130907, ¶ 10. Under the plain error doctrine, the defendant must first show that a clear and obvious error occurred, and then that (1) the evidence at sentencing was closely balanced, or (2) the error was so egregious that it denied the defendant a fair sentencing hearing. *Wooden*, 2014 IL App (1st) 130907, ¶ 10. Absent error, there can be no plain error. *Wooden*, 2014 IL App (1st) 130907, ¶ 10.

¶ 44    First, defendant alleges the court misapprehended the evidence where it acquitted him of the charges involving Alexus, but, at sentencing, stated that the notion defendant did not know of Alexus's presence was "fantasy." Defendant observes that Hightower's letter alleged that he "looked" her and Alexus "in the eye" and tried to "kill" them, yet no evidence suggested that he knew Alexus was in the vehicle; rather, at trial, Hightower testified that the vehicle had tinted windows and she could not alert defendant to Alexus's presence before he fired.

¶ 45    Although the trial court has great discretion in imposing sentence, it abuses that discretion by imposing a sentence based upon a manifest error of fact. See, *e.g.*, *People v. Johnson*, 227 Ill. App. 3d 800, 817 (1992). In that situation, the sentence should be vacated and the cause remanded

for resentencing unless the error was so insignificant that it did not increase the sentenced imposed. *People v. Ross*, 303 Ill. App. 3d 966, 984 (1999). "In determining whether the trial court improperly imposed a sentence, this court will not focus on isolated statements but instead will consider the entire record." *People v. Walker*, 2012 IL App (1st) 083655, ¶ 30.

¶ 46    Taking the court's comments in context, we find it did not misapprehend the evidence. Though defendant was acquitted of the counts against Alexus, the evidence did not establish that he did not know she was in the vehicle. The evidence did show, however, that defendant pointed his firearm at Hightower, who was a passenger, and therefore, defendant knew that more than one person was in the vehicle when he fired. Alexus was in the backseat, and some of the bullets lodged in the backseat and in a rear passenger door. As the court noted, each bullet fired by defendant "goes where it goes." Considering the record as a whole, it is apparent the trial court did not misapprehend the facts or mistakenly rely on Hightower's letter, but rather, accurately characterized defendant's conduct in view of the evidence presented at trial.

¶ 47    Second, defendant claims the court considered a factor inherent in the offense, namely, that his conduct was intentional. See *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41 (intent to kill is an element of attempted first degree murder). Defendant argues that the court remarked that his actions were not "incidental," and that defendant "made a conscious decision" to fire at the vehicle in the "epitome" of "attempt first degree murder."

¶ 48    A trial court may not consider a factor inherent to the offense in aggravation. *People v. Reed*, 2018 IL App (1st) 160609, ¶ 55. This rule, however, "is not meant to be applied rigidly," as "sound public policy dictates that a sentence be varied in accordance with the circumstances of the offense." (Internal quotation marks omitted.) *People v. Spicer*, 379 Ill. App. 3d 441, 468 (2007).

Thus, the court may properly consider the nature and circumstances of the offense, including "the nature and extent of each element of the offense as committed by the defendant." *People v. Brewer*, 2013 IL App (1st) 072821, ¶ 55.

¶ 49    Although the trial court commented on defendant's intentions, those comments were not directed to his volition in committing the offense, but rather, his decision to target Hightower. As the court explained, defendant did not target a stranger, but rather, "knew the victim" and her family. Defendant chose to fire a weapon, at close range, toward a person who had known him all his life. The court, therefore, did not improperly consider a factor inherent in the offense, but instead, properly identified an egregious aspect of defendant's conduct.

¶ 50    Third, defendant argues that the court imposed a double enhancement by relying on his use of a firearm "to increase his sentence from the 26-year minimum," notwithstanding that the sentence already included a 20-year firearm enhancement.

¶ 51    Double enhancement occurs when (1) a single factor is used an element of the offense and as an aggravating factor at sentencing, or (2) when the same element is used twice to elevate the severity of an offense itself. *People v. Phelps*, 211 Ill. 2d 1, 11-14 (2004). The rule reflects the presumption that the legislature considered the elements of the crime when designating the appropriate sentencing range. *Phelps*, 211 Ill. 2d at 12 (citing *People v. Rissley*, 165 Ill. 2d 364, 390 (1995)).

¶ 52    No double enhancement occurred here. While the court referenced the firearm at sentencing, it could not discuss the harm defendant caused without describing his conduct. Thus, the court fairly, albeit graphically, noted "the horror" of defendant's conduct in "pumping a vehicle with .9 millimeter rounds," with two striking Hightower and "rip[ing] through her flesh." The

shooting had serious repercussions for Hightower, who experienced physical injuries, mental instability, and anguish from the knowledge that defendant, whom she had known all his life, "had no remorse when he was behind that gun, pulling that trigger." The court's decision to impose a sentence above the statutory minimum, therefore, did not depend on defendant's use of a firearm, but rather, the harm he caused with it. Defendant's position is, therefore, not persuasive.

¶ 53    Fourth, defendant contends that his sentence reflected factors unsupported by the evidence, but instead, the court's personal beliefs and experience. Specifically, defendant challenges the court's discussion of the psychological damage that firearm violence inflicted on Hightower, on the community, and on the court's discussion about the court's experience in the Marines.

¶ 54    A sentencing determination that relies on the trial court's own experience or investigation constitutes a denial of due process. *People v. Patterson*, 2017 IL App (3d) 150062, ¶ 34. However, personal comments or observations of the court "are generally of no consequence where the record shows the court otherwise considered proper sentencing factors." (Internal quotation marks omitted.) *People v. Walker*, 2012 IL App (1st) 083655, ¶ 33; see also *People v. Steppan*, 105 Ill. 2d 310, 323 (1985) (where "the record clearly shows" that the judge consider proper sentencing factors, including the need to "protect the public," the judge's "personal observations before imposing sentence, while not to be encouraged, [are] of no consequence").

¶ 55    At trial, evidence established that Hightower grew up with defendant's family and knew him since he was child. During the offense, Hightower observed defendant point the weapon at her and fire multiple times from close range. Bullets struck Hightower's back and hip. In her letter, Hightower explained how defendant "ruined" her life and the lives of her six children. Due to fear, she left the community where she had lived her whole life. Ongoing stress made it difficult for her

to take her children to activities, and due to her injuries and mental instability, she could not work and experienced financial difficulty.

¶ 56    During sentencing, the court recognized these circumstances in discussing the "psychological damage" to Hightower and the community when people "cannot move about" or "live their lives without people like [defendant] trying to take those lives away." These comments were not speculative or based on information *de hors* the record, but rather, reflected Hightower's account of how the shooting uprooted her from her community and impacted her life and the lives of her children. To the extent the court referenced its familiarity with Marines who faced gunfire in combat, those comments illustrated the severity of the trauma of the shooting on victims and the long-term effects it had on Hightower, a civilian who nonetheless experienced "the horror of surviving being a stationary target of another individual." While the court suggested, in passing, that it had specific combat veterans in mind, those comments were minimal and analogized the serious consequences of the firearm violence in the instant case. This was not error.

¶ 57    Fifth, defendant argues the court adhered to an impermissible "personal practice" for sentencing in attempted murder cases. Defendant relies on a discussion that occurred during pretrial proceedings when the State announced that it had withdrawn a plea offer. The court asked the State to "articulate" the offer, and the State explained that "the victim *** would be comfortable with an offer no lower than 20 years." The State added that the case involved a firearm and multiple victims, including one who had been shot. The following colloquy occurred:

> "THE COURT: *** Well, I don't know all the facts to the situation, but, sir, with an attempt murder situation, and the State is talking 20 years, you may want to look at that. I don't typically give 20 years out for attempt murder.

* * *

    [DEFENSE COUNSEL]: *** Obviously we have some factual disagreements—

    THE COURT: That's fine.

    [DEFENSE COUNSEL]:—being alleged by the State.

    THE COURT: But attempt murder, just a generic situation, I would be in that range or higher."

¶ 58    Based on the foregoing, defendant argues that because his sentence is 40 years—including a firearm enhancement—it reflects the court's personal practice of imposing a 20-year minimum term for all convictions for attempted murder.

¶ 59    "[T]he trial court may not have a personal sentencing policy that fails to conform to the standards" of the Unified Code of Corrections (730 ILCS 5/1-1.1 *et seq.* (West 2014)). *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 55; see also *People v. Bolyard*, 61 Ill. 2d 583, 587 (1975) (ordering new sentencing hearing when record affirmatively showed, during posttrial proceedings, that trial judge arbitrarily denied probation because defendant "fell within the trial judge's category of disfavored offenders"). Notwithstanding, "there  is a strong presumption that the trial court's sentence was based on proper legal reasoning, and a reviewing court should consider the record as a whole rather than a few isolated statements." *Musgrave*, 2019 IL App (4th) 170106, ¶ 55. The defendant has the burden to affirmatively establish that his sentence reflected improper factors. *Musgrave*, 2019 IL App (4th) 170106, ¶ 55.

¶ 60    Examining the judge's pretrial comments in view of the record from defendant's trial and sentencing hearing, we find no error. During the pretrial colloquy, the court stated that it did not "typically" impose 20-year sentences for attempted murder, but did not state this was an immutable

sentencing policy. Likewise, while the court added that it would contemplate a term of at least 20 years for a "generic" attempted murder, the court cautioned, during that same dialogue, that it did not know all the facts of the case.

¶ 61     Notably, after the court heard the evidence at trial and the cause proceeded to sentencing, the court explained that it was "mindful of the [s]entencing range" and made no reference to a sentencing policy. Rather, the court expressed a number of reasons for its sentence, including defendant's lack of remorse, the effect of the shooting on the victim, and defendant's relationship to the victim. Nothing in the record establishes that the court imposed defendant's sentence based on personal practices or policy considerations.

¶ 62     Given the preceding, defendant has not established error as to any of the sentencing issues that he failed to preserve. Plain error review is, therefore, unmerited. See *Wooden*, 2014 IL App (1st) 130907, ¶ 10. Finally, although defendant also argues that counsel was ineffective for not preserving these issues, defendant's failure to establish error renders that claim meritless as well. *People v. Jackson*, 2020 IL 124112, ¶¶ 90-91 (ineffective assistance claim fails absent underlying error).

¶ 63     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 64     Affirmed.