NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231560-U

NO. 4-23-1560

IN THE APPELLATE COURT

FILED
August 27, 2024
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Stephenson County |
| ANTHONY S. ROSS, | ) | No. 23CF118 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Glenn R. Schorsch, |
| | ) | Judge Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices Steigmann and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court granted appellate counsel's motion to withdraw and affirmed
the trial court's judgment as no issue of arguable merit could be raised on appeal.

¶ 2     Following a bench trial, the trial court found defendant, Anthony S. Ross, guilty of

residential burglary (720 ILCS 5/19-3(a) (West 2022)), theft (720 ILSC 5/16-1(a) (West 2022)),

and resisting a peace officer (720 ILCS 5/31-1 (West 2022)). The court sentenced defendant to

eight years in prison for residential burglary. Defense counsel filed a motion for a new trial but did

not file a motion to reconsider the sentence. Defendant timely appealed, and the court appointed

counsel to represent him.

¶ 3     Counsel now seeks to withdraw pursuant to the procedure in *Anders v. California*,

386 U.S. 738 (1967), contending any argument he might make would be meritless. Defendant has

not filed a response. We grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5            On May 22, 2023, the State charged defendant with residential burglary, theft, and

resisting a peace officer as a result of a series of events that occurred on May 20, 2023. The State

filed a motion *in limine* to admit evidence that defendant committed a retail theft at Cub Foods

shortly before the charged residential burglary. Over defense counsel's objection, the trial court

allowed the State to admit surveillance video from Cub Foods. However, the court barred the State

from arguing at trial that defendant's guilty plea to retail theft conclusively established that certain

items found at the scene of the residential burglary were items defendant had stolen from Cub

Foods. The matter proceeded to a bench trial, and the following is a summary of the evidence.

¶ 6            Around 7 a.m. on May 20, 2023, defendant, who had a face tattoo, entered a Cub

Foods grocery store in Freeport, Illinois. Cub Foods employees testified, and the security video

from the store showed, that he was wearing a black hooded sweatshirt that said "Champion" on it

with the hood up, black leggings, and sunglasses. Defendant got a cart and walked around several

aisles, including the frozen food aisle and the meat aisle, and put some items into his cart. Though

the video was not clear enough to see precisely what he was putting in his cart, he stopped and

reached into both a freezer and fridge that Cub Foods employees testified contained, among similar

items, summer sausages and "Uncrustables." While defendant was shopping, employees in the

meat department notified the store manager that defendant looked suspicious. The manager

followed defendant around the store to monitor whether he was shoplifting. Rather than purchase

any items, however, defendant dumped several items into a cooler near the self-checkout aisles

and left the store at 7:17 a.m. with a black bag in his hand. After exiting the store, defendant walked

north.

¶ 7        Two blocks north of Cub Foods—a five-minute walk away—Kelli Wheeler and her husband, James Wheeler, woke up around 7 a.m. and started on some yard work. Kelli was along the side of the house and James was in the front yard. Around 7:30 a.m., Kelli walked back into her house through the back door and found a man crouched in her bedroom. The man was wearing all black—black shoes, black pants, a black hooded sweatshirt, a black ball cap underneath his raised hood, and black sunglasses. Kelli did not mention in her testimony that this person had a face tattoo. Kelli yelled at him to get out of her house, and he got up and started to run. However, Kelli was in the doorway. In his efforts to leave the house, he knocked her over and they fell down a set of three steps and through the screen door, landing on the back patio. Several items spilled out onto the patio from the man's hooded sweatshirt, including Kelli's purse, which he had taken from her bedroom. After a tussle, the man stood up, grabbed Kelli's purse from the ground, and ran through the backyard to exit through an opening in between fences. Kelli testified that the whole interaction lasted two minutes or less.

¶ 8        Kelli immediately ran to the front yard to get James's attention, and he told her to call 911. She made the call at 7:33 a.m. In the meantime, James ran to the back of the house and discovered several items strewn about their back patio: car keys and several other items from Kelli's purse, a summer sausage, one "Uncrustable," and candy. The food items did not belong to Kelli and James; rather, they were items that the man dropped when he pushed Kelli out of the back door to get out.

¶ 9        A few moments later, Officer Manuel Godinez responded to the scene. He observed Kelli "hyperventilating" and "thought she might have a heart attack," so he called an ambulance to assist her. When he inspected the backyard of the house, he found Kelli's purse hanging from

the fence through which the man escaped. He took photos of the scene and collected the food items that did not belong to the Wheelers.

¶ 10        Officer Godinez took the food items to Cub Foods because "when [he] looked at it at 7:34 in the morning *** there[ was] nothing open—no stores open—except for Cub Foods." He admitted at trial that there were other grocery stores within 10 blocks that were open at that time. However, he pointed out that Cub Foods was the closest by far, as it was two blocks away, while the second nearest was "five or six blocks" and "[n]o less than [a] ten minute[ ]" walk away. At Cub Foods, Officer Godinez spoke to the store manager and gave him a description of the man who was in the Wheelers' home. The manager immediately identified defendant as being the man Officer Godinez was talking about and showed the store surveillance video to the officer, who took a still photo of defendant from the video. Officer Godinez then asked if the food items left in the Wheelers' backyard were sold at Cub Foods, and the manager confirmed that they were. However, the manager testified that there was no way to specifically identify whether those particular items had come from his Cub Foods store.

¶ 11        Officer Godinez then returned to the Wheelers' home and showed Kelli the photo of defendant from the surveillance video at Cub Foods. Kelli confirmed that he was the man she encountered in her house that morning.

¶ 12        Later that day, at 5:40 p.m., Officer Jordan Brickson, along with Officer Juan Garduno, who had both been shown a photo of defendant as part of the ongoing investigation into the residential burglary, located defendant walking through an intersection in Freeport. He was wearing a gray tank top and shorts, but the officers recognized his face tattoo. When the officers attempted to approach defendant, he "kicked off his sandals and took off running" southwest through some yards. He was taken into custody and transported to the Freeport police station. He

was given *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and upon questioning, he initially said he was at Cub Foods that morning. He later denied being there that morning and said he was there the previous night.

¶ 13　　　　The next day, May 21, 2023, the police returned to the Wheelers' residence and showed Kelli a photo lineup. Kelli selected someone other than defendant from the lineup. She testified that "nobody is going to be able to be a hundred percent certain because of how much coverage the person had," and she "never had a full view of the person on that day."

¶ 14　　　　On May 23, 2023, one block away from the Wheelers' house, David Lincoln found several items in his backyard that did not belong to him. Lincoln testified that the items could have been there for up to 24 or 48 hours before he noticed them. The police collected these items, including Kelli's wallet (with her license and cards in it), a black phone case, black sunglasses, a T-shirt, and a black hooded sweatshirt that said "Champion" across the front. James testified that the phone case found in Lincoln's backyard was identical to his phone case that went missing on May 20, 2023.

¶ 15　　　　The Freeport police subsequently sent the black T-shirt and hooded sweatshirt to the forensic science laboratory for DNA testing. The forensic technician swabbed the neck of the T-shirt to collect a sample. The DNA testing revealed that there were three unique sets of DNA on the T-shirt: one contributed 94% of the DNA, another contributed 4%, and the last contributed 2%. Defendant's DNA matched that of the 94% contributor. The technician testified that it was "approximately 13 octillion times more likely" than not that defendant's DNA was on the T-shirt.

¶ 16　　　　During closing arguments, defense counsel conceded that defendant was "clearly *** guilty" of resisting a peace officer and already pleaded guilty to the charge of retail theft at Cub Foods. However, defense counsel argued that because the State was not able to prove that

defendant stole the specific food items found at the Wheelers' residence, he could not be conclusively linked to the burglary. Defense counsel focused on the facts that the Cub Foods employees did not see defendant steal a whole box of "Uncrustables" and did not find an open box of "Uncrustables," out of which defendant could have taken just one sandwich. Nor did the employees inventory what items defendant dumped into the cooler at the front of the store before exiting. Defense counsel also pointed out that Kelli was unable to identify defendant in the photo lineup, despite multiple witnesses testifying that he had a distinguishable face tattoo.

¶ 17        On November 7, 2023, the trial court found defendant guilty of residential burglary, theft, and resisting a peace officer, citing "the totality of the evidence, the circumstances surrounding the timing, [and] the identification that was made based on the still picture and the DNA match." The court recognized that Kelli "was unable to identify the Defendant in this case *** in a photo line-up," that "it was never verified that [the] particular summer sausage was inventoried or on the shelf at all at Cub Foods," and that Cub Foods was not "the only store open" at the early hour that day.

¶ 18        Defendant's presentence investigation report indicated that his criminal history included convictions for 5 burglaries in 2001 and 2005, petty theft in 2000, felony "bail jumping" in Wisconsin in 2001, 12 traffic citations between 2000 and 2023, and obstructing an officer in 2019. He spent two years in the Department of Corrections for the 2001 burglary and "bail jumping" and three years for the four 2005 burglaries that were resolved together.

¶ 19        On December 19, 2023, the trial court denied defendant's posttrial motion and proceeded to sentencing. As aggravating factors, the State cited defendant's prior criminal activity, including five prior burglary convictions; the necessity to deter others from committing the same crime; and the impact on the victim, Kelli, who testified at the hearing that she no longer felt safe

in her home. Defense counsel, in turn, asked the court to take into consideration defendant's drug addiction, that he had no intent to harm anyone, and that his five prior burglary convictions arose from only two incidents, not five. Defendant made a statement in allocution that he was "extremely sorry that happened to Ms. Wheeler." However, he added that "even if [he] had committed this, there is 18 years in between" this and his other burglary offenses, so "[i]t's not like [he's] a menace to society or nothing like that." The State asked for a 12-year prison sentence; defense counsel conceded that any sentence would "obviously be a term in excess of the four years" and asked for the "recommended minimum sentence" of four years.

¶ 20     The trial court found that defendant "take[s] no accountability for it, nor do[es he] take accountability for some of the prior offenses" and has a "drug problem." The court was "concerned that [defendant is] capable of committing further crimes." Ultimately, the court sentenced defendant to eight years in the Illinois Department of Corrections for residential burglary. The court determined that the other counts merged for the purposes of sentencing.

¶ 21     This appeal followed.

¶ 22                              II. ANALYSIS

¶ 23     Appellate counsel moves for leave to withdraw. Counsel supports his motion with a memorandum, which states he considered raising the following issues on defendant's behalf: (1) whether the State proved defendant guilty beyond a reasonable doubt, (2) whether the trial court abused its discretion in admitting evidence pertaining to a prior retail theft, and (3) whether defendant received an excessive sentence. Counsel explains why he concluded none of these issues have arguable merit. Defendant did not file a response.

¶ 24     We consider appellate counsel's motion to withdraw under the procedure set out in *Anders*. After examining the record, we agree that the three issues counsel identifies lack arguable

merit, and we have identified no other arguably meritorious issues. We therefore grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 25                                      A. Sufficiency of the Evidence

¶ 26        When a defendant challenges the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. "This standard of review applies in all criminal cases, whether the evidence is direct or circumstantial," and "circumstantial evidence that meets this standard is sufficient to sustain a criminal conviction." *People v. Jackson*, 2020 IL 124112, ¶ 64. It is the function of the trier of fact to determine the credibility of the witnesses, decide the weight to be given to their testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence. *People v. Baker*, 2022 IL App (4th) 210713, ¶ 35. The trier of fact's credibility determinations are entitled to great weight. *Baker*, 2022 IL App (4th) 210713, ¶ 35. This court will not set a criminal conviction aside "unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 27        To convict defendant of burglary, the State had to prove beyond a reasonable doubt that there was "an entry that was both without authority and with the intent to commit a felony or theft." *United States v. Glispie*, 2020 IL 125483, ¶ 12. But "it is not necessary that the trier of fact find each fact in the chain of circumstances beyond a reasonable doubt. Rather, the trier of fact must find only that the evidence taken together supports a finding of the defendant's guilt beyond a reasonable doubt." *Jackson*, 2020 IL 124112, ¶ 70. In making this finding, "the trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor need it

- 8 -

search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Jackson*, 2020 IL 124112, ¶ 70.

¶ 28        In *People v. Gill*, 2018 IL App (3d) 150594, for example, the defendant argued that the evidence was entirely circumstantial and insufficient to sustain his conviction. In that case, the defendant was convicted of arson where he smelled like gasoline after the crime, was identified in surveillance video running away from the fire, drove away in a truck that had the same identifiable characteristics as the defendant's truck, and left a hooded sweatshirt with burn marks and his DNA adjacent to the parking lot. On the other hand, there was no video depicting the defendant's face, there was no eyewitness, the State's evidence of a lighter in the defendant's truck could not be more conclusively tied to the fire than any other lighter, and the gas can and rag in his truck had "minimal probative value absent any indication that those items were especially unique." *Gill*, 2018 IL App (3d) 150594, ¶ 66. The Third District rejected the defendant's "competing theories" that this chain of events was a mere coincidence and held that the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt. *Gill*, 2018 IL App (3d) 150594, ¶ 67. The same is true here.

¶ 29        Defense counsel conceded at trial that defendant was at Cub Foods the morning of May 20, 2023, and was the man seen on the surveillance video leaving the store at 7:17 a.m. The video showed defendant heading north when he left the store—in the direction of the Wheelers' residence, just two blocks north and five minutes away. He was wearing all black, with a hooded sweatshirt emblazoned with "Champion" across the front in big letters. About 10 minutes later, Kelli saw a man matching that description in her house, stealing her purse and other items from her bedroom. When that man knocked Kelli to the ground on the way out, he dropped a number of food items, all of which are sold at Cub Foods. A few hours later, when officers showed Kelli

a photo of defendant from the Cub Foods surveillance video, she identified him immediately as the man who was in her house, as he "was dressed exactly like the person that was in [her] house" and "[w]hat you could see of the face looked exactly like the person that was in the house." Three days later, the Wheelers' neighbor found a black T-shirt and hooded sweatshirt with the "Champion" logo on it in his backyard. DNA on the T-shirt matched defendant's DNA. As the trial court pointed out, "the number of coincidences that would have had to have fallen in place" for all of these events to be unconnected would be remarkable.

¶ 30       It is true that the food items dropped in the Wheelers' backyard were never conclusively traced back to the Cub Foods store, and Kelli identified a different person from a photo lineup. However, Kelli saw the perpetrator cloaked in a black hooded sweatshirt with the hood up, a hat, and sunglasses. Moments later, they were tumbling to the ground, and he ran away. The whole encounter, in her words, was "very quick." A reasonable factfinder could determine that Kelli's limited opportunity to view the perpetrator's face explained why she did not testify to defendant's face tattoo or recognize him in the lineup. See *People v. Booker*, 2015 IL App (1st) 131872, ¶ 76 (noting that witness's failure to mention the defendant's face tattoo did not make her testimony unreliable, as even the trial court remarked that "it did not observe 'any tattoos visible on [defendant's] face' " at trial). The court in this case also remarked that "from the angle I'm looking at right now. [*sic*] I do not see the tattoo. And I see three quarters or more of his face." The court thus considered Kelli's misidentification in the photo and concluded that "[f]ace-to-face identifications carry with them a high degree of error for whatever reason it is, but it's been proven time and again, there was other intrinsic evidence in this case that led directly to [defendant]."

¶ 31       As in *Gill*, where there was no eyewitness and the physical evidence could not be conclusively tied to the crime, Kelli's lineup misidentification is not fatal to the State's case

because the remainder of the evidence—even if circumstantial—was sufficient to prove defendant guilty beyond a reasonable doubt. See *People v. Brown*, 38 Ill. App. 3d 248, 251 (1976) (holding that there was sufficient evidence to convict the defendant, even though the witness did not identify the defendant in a lineup, because other testimony and evidence was sufficient). It thus follows that a rational trier of fact could have so found.

¶ 32                    B. Admission of Evidence of a Prior Retail Theft

¶ 33        Appellate counsel states that he considered arguing that the surveillance video of defendant's theft from Cub Foods was improperly admitted. Counsel is correct that this argument would have no merit. Evidence of other crimes is generally "inadmissible where that evidence is relevant solely to establish a defendant's propensity to commit crime." *People v. Rohlfs*, 322 Ill. App. 3d 965, 968 (2001). But it is "admissible where relevant for a purpose other than to show the propensity to commit crime," such as "intent, identity, motive, absence of mistake, *modus operandi* [citation], or the existence of a common scheme or plan." *Rohlfs*, 322 Ill. App. 3d at 968. The trial court must " 'weigh the relevance of the evidence to establish the purpose for which it is offered against the prejudicial effect the introduction of such evidence may have upon the defendant.' " *People v. Smith*, 2019 IL App (4th) 160641, ¶ 58 (quoting *People v. Stewart*, 105 Ill. 2d 22, 62 (1984), *abrogated on other grounds by People v. Gacho*, 122 Ill. 2d 221 (1988)). The court may not admit the evidence "if its prejudicial impact substantially outweighs its probative value." *People v. Chapman*, 2012 IL 111896, ¶ 19. "A trial court's ruling on a motion to admit other-crimes evidence is reviewed for an abuse of discretion." *People v. Peterson*, 2017 IL 120331, ¶ 125. It can only be overturned if the "court's decision is 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *Peterson*, 2017 IL 120331, ¶ 125

- 11 -

(quoting *People v. McDonald*, 2016 IL 118882, ¶ 32). Because the surveillance video was admitted to establish defendant's identity, it was properly admitted.

¶ 34    Here, the trial court granted the State's motion *in limine* to admit the surveillance video of defendant at Cub Foods, which the State planned to introduce "for identity purposes only." The surveillance video depicting defendant's clothing and location less than 20 minutes before the residential burglary was highly probative to establish the perpetrator's identity, as defendant's case primarily rested on the argument that there was insufficient proof to identify him as the man who was in the Wheelers' house. See, *e.g.*, *People v. Johnson*, 368 Ill. App. 3d 1146, 1158 (2006) (upholding admission of other crimes evidence that was pro

¶ 35    ative of the defendant's identity when the defendant asserted mistaken identity as a defense); *People v. Shief*, 312 Ill. App. 3d 673, 682 (2000) (other crimes evidence was admissible where it showed that "[t]he offender in each case wore clothing that was strikingly similar to the clothing recovered from defendant's possession"); *People v. Wilson*, 257 Ill. App. 3d 826, 831-32 (1994) (other crimes evidence was admissible where (1) "[t]he arrest [for the other crime] took place five blocks from the location of the charged offenses and within one-half hour of the charged offenses," (2) the victim "identified defendant's sweatshirt" at the time of his arrest as the same one the perpetrator wore, and (3) the arresting officer's testimony "placed the items stolen from [the victims] in [defendant's] possession"). Here, the testimony at trial about the surveillance video centered around what defendant was wearing and what food products he could have had in his possession—which " 'clearly tended to identify defendant as the perpetrator of the [crime charged], in light of the evidentiary links between the two crimes.' " *People v. Martin*, 2012 IL App (1st) 093506, ¶ 41 (quoting *People v. Richardson*, 123 Ill. 2d 322, 339-40 (1988)). Admitting evidence of the retail theft was not an abuse of discretion.

¶ 36                                     C. Sentencing

¶ 37        Appellate counsel next states that he considered challenging the trial court's consideration of mitigating and aggravating factors, as well as the length of the sentence. At the sentencing hearing, defense counsel raised no contemporaneous objections, nor did he file a motion to reconsider the sentence after the hearing. Thus, any challenges to sentencing errors have been forfeited. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). There is "a narrow and limited exception" to the rule of procedural forfeiture under the plain error doctrine, which requires the defendant to show that "a clear or obvious error occurred" and "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545. Here, appellate counsel is correct that there was no clear or obvious error at trial that would entitle defendant to reversal under plain error review.

¶ 38        "[A] reviewing court presumes that a sentence imposed within the statutory range" is proper. *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 56. Under this standard, we give "substantial deference to the trial court's sentencing decision because the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. A sentence will only be reversed if it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 39        Furthermore, when sentencing a defendant, the trial court must carefully consider all factors in aggravation and mitigation, including "the defendant's age, demeanor, habits,

mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990). There is "a strong presumption that the trial court's sentence was based on proper legal reasoning, and a reviewing court should consider the record as a whole rather than a few isolated statements." *Musgrave*, 2019 IL App (4th) 170106, ¶ 55. A reviewing court "may not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Musgrave*, 2019 IL App (4th) 170106, ¶ 56. Critically, "defendant bears the burden to affirmatively establish that his sentence was based on an improper factor." *Musgrave*, 2019 IL App (4th) 170106, ¶ 55.

¶ 40       Causing or threatening serious physical harm to another, a history of criminal activity, and the necessity to deter others from committing the same crime are aggravating factors that can extend a sentence. 730 ILCS 5/5-5-3.2(a)(1), (3), (7) (West 2022). Likewise, a trial court may properly consider a defendant's lack of remorse and continued claims of innocence because they "place[ ] serious doubt upon [the defendant's] willingness to undergo treatment for any character deficiencies that might have contributed to his criminality." *People v. Barger*, 251 Ill. App. 3d 448, 468 (1993) (finding the trial court properly considered the defendant's "continued protestations of innocence at his sentencing hearing" as an aggravating factor where the defendant stated he would "undergo therapy to solve this problem *if he had it*" (emphasis in original)). On the other hand, a defendant's drug addiction "is a 'double-edged sword' that the trial court may view as a mitigating or aggravating factor." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 105 (quoting *People v. Mertz*, 218 Ill. 2d 1, 83 (2005)).

¶ 41       In this case, the applicable range for the term of imprisonment for residential burglary, a Class 1 felony (720 ILCS 5/19-3(b) (West 2022)), is "not less than 4 years and not

more than 15 years." 730 ILCS 5/5-4.5-30(a) (West 2022). The trial court imposed a sentence of eight years.

¶ 42     We begin with the applicable presumptions: the sentence is proper because it is within the statutory range and the trial court based its sentencing determination on proper legal reasoning. We see no reason to discard these presumptions. The court took into account a number of factors, including defendant's comment that he was "extremely sorry that happened to Ms. Wheeler," but "even if [he] had committed this," it was "not like [he's] a menace to society." The court noted that (1) defendant "t[ook] no accountability" for this or his prior offenses, as demonstrated by his continuous denials, (2) "t[ook] advantage" of a "husband and wife" while they were "taking care of their house," (3) "violently pushed the homeowner down," (4) had "prior offenses" and "a drug problem," and (5) was "capable of committing further crimes." On the other hand, the court noted that defendant "appear[ed] healthier" since he was put in custody and was "still young enough to turn it around." The court's careful consideration of these factors—causing or threatening serious harm, a history of prior criminal activity, likelihood of recurrence, necessity to deter others, lack of remorse and accountability, and drug addiction—was proper and supported by the record. Defendant cannot demonstrate that the court relied on an improper factor or that the sentence was "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. Because there was no error, let alone clear error, we agree with appellate counsel that an argument to the contrary would be frivolous, and we affirm the sentence.

¶ 43                    III. CONCLUSION

¶ 44     For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 45   Affirmed.